# CRAWFORD ET AL. *v.* BOARD OF EDUCATION OF THE CITY OF LOS ANGELES ET AL.

No. 81–38.   Argued March 22, 1982—Decided June 30, 1982

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 545. MARSHALL, J., filed a dissenting opinion, *post*, p. 547.

*Laurence H. Tribe* argued the cause for petitioners. With him on the briefs were *Fred Okrand, Mark D. Rosenbaum, Mary Ellen Gale, Bruce J. Ennis, E. Richard Larson,* and *Paul Hoffman.*

*G. William Shea* argued the cause for respondents. With him on the brief for respondent Board of Education of City of Los Angeles were *Peter W. James, David T. Peterson, Michael M. Johnson* and *Jerry F. Halverson. Cliff Fridkis* filed a brief for respondent Bustop, Inc.

*Solicitor General Lee* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the

brief were *Assistant Attorney General Reynolds, Deputy Solicitor General Wallace,* and *Richard G. Wilkins.**

JUSTICE POWELL delivered the opinion of the Court.

An amendment to the California Constitution provides that state courts shall not order mandatory pupil assignment or transportation unless a federal court would do so to remedy a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The question for our decision is whether this provision is itself in violation of the Fourteenth Amendment.

I

This litigation began almost 20 years ago in 1963, when minority students attending school in the Los Angeles Unified School District (District) filed a class action in state court

*Briefs of *amici curiae* urging reversal were filed by *Steven Shiffrin* for the African American Education Commission et al.; by *Louis E. Wolcher, Mark N. Aaronson, Vilma S. Martinez, Peter Roos, William L. Robinson,* and *Norman J. Chachkin* for the Lawyers' Committee for Civil Rights Under Law et al.; and by *Alan G. Marer, William T. Keogh,* and *Joseph Cotchett* for Margaret Tinsley et al.

Briefs of *amici curiae* urging affirmance were filed by *George Deukmejian,* Attorney General, *Willard A. Shank,* Chief Assistant Attorney General, *Richard D. Martland,* Assistant Attorney General, and *Geoffrey L. Graybill,* Deputy Attorney General, for the State of California; by *Anthony D. Blankley* for Congresswoman Bobbi Fielder; and by *G. Kip Edwards* and *Michael D. Torpey* for the Palo Alto Unified School District.

Briefs of *amici curiae* were filed by *John H. Larson, James W. Briggs, Allan B. McKittrick,* and *Steven J. Carnevale* for the County of Los Angeles; by *Leonard Sacks,* for State Senator Alan Robbins; by *Thomas F. Casey III* for the Belmont School District et al.; by *Penn Foote* for the California Teachers Association; by *Robert H. Finch* for the Citizens Legal Defense Alliance, Inc.; by *Myron D. Alexander* for the League of Women Voters of California; by *John McTernan* and *George Slaff* for the Members of the Bar of the State of California; and by *Ronald A. Zumbrun* and *John H. Findley* for the Pacific Legal Foundation.

seeking desegregation of the District's schools.[1]   The case
went to trial some five years later, and in 1970 the trial court
issued an opinion finding that the District was substantially
segregated in violation of the State and Federal Constitu-
tions.   The court ordered the District to prepare a deseg-
regation plan for immediate use.   App. 139.

On the District's appeal, the California Supreme Court af-
firmed, but on a different basis.   *Crawford* v. *Board of Edu-
cation*, 17 Cal. 3d 280, 551 P. 2d 28 (1976).   While the trial
court had found *de jure* segregation in violation of the Four-
teenth Amendment of the United States Constitution, see
App. 117, 120–121, the California Supreme Court based its
affirmance solely upon the Equal Protection Clause of the
State Constitution.[2]   The court explained that under the
California Constitution "state school boards . . . bear a con-
stitutional obligation to take reasonable steps to alleviate
segregation in the public schools, whether the segregation be

---

[1] In 1980 the District included 562 schools with 650,000 students in an
area of 711 square miles.   In 1968 when the case went to trial, the District
was 53.6% white, 22.6% black, 20% Hispanic, and 3.8% Asian and other.
By October 1980 the demographic composition had altered radically: 23.7%
white, 23.3% black, 45.3% Hispanic, and 7.7% Asian and other.   See 113
Cal. App. 3d 633, 642, 170 Cal. Rptr. 495, 501 (1981).

[2] "The findings in this case adequately support the trial court's conclusion
that the segregation in the defendant school district is de jure in nature.
We shall explain, however, that we do not rest our decision on this charac-
terization because we continue to adhere to our conclusion in [*Jackson* v.
*Pasadena City School Dist.*, 59 Cal. 2d 876, 382 P. 2d 878 (1963)] that
school boards in California bear a constitutional obligation to take reason-
ably feasible steps to alleviate school segregation 'regardless of its cause.'"
*Crawford* v. *Board of Education*, 17 Cal. 3d, at 285, 551 P. 2d, at 30.   The
court explained that federal cases were not controlling:

"In focusing primarily on . . . federal decisions . . . defendant ignores a sig-
nificant line of California decisions, decisions which authoritatively estab-
lish that in this state school boards do bear a constitutional obligation to
take reasonable steps to alleviate segregation in the public schools,
whether the segregation be de facto or de jure in origin." *Id.*, at 290, 551
P. 2d, at 33–34.

de facto or de jure in origin." 17 Cal. 3d, at 290, 551 P. 2d, at 34. The court remanded to the trial court for preparation of a "reasonably feasible" plan for school desegregation. *Id.*, at 310, 551 P. 2d, at 48.[3]

On remand, the trial court rejected the District's mostly voluntary desegregation plan but ultimately approved a second plan that included substantial mandatory school reassignment and transportation—"busing"—on a racial and ethnic basis.[4] The plan was put into effect in the fall of 1978, but after one year's experience, all parties to the litigation were dissatisfied. See 113 Cal. App. 3d 633, 636, 170 Cal. Rptr. 495, 497 (1981). Although the plan continued in operation, the trial court began considering alternatives in October 1979.

In November 1979 the voters of the State of California ratified Proposition I, an amendment to the Due Process and

---

[3] In stating general principles to guide the trial court on remand, the State Supreme Court discussed the "busing" question: "While critics have sometimes attempted to obscure the issue, court decisions time and time again emphasized that 'busing' is not a constitutional end in itself but is simply one potential tool which may be utilized to satisfy a school district's constitutional obligation in this field. . . . [I]n some circumstances busing will be an appropriate and useful element in a desegregation plan, while in other instances its 'costs,' both in financial and educational terms, will render its use inadvisable." *Id.*, at 309, 551 P. 2d, at 47. It noted as well that a state court should not intervene to speed the desegregation process so long as the school board takes "reasonably feasible steps to alleviate school segregation," *id.*, at 305, 551 P. 2d, at 45, and that "a court cannot properly issue a 'busing' order so long as a school district continues to meet its constitutional obligations." *Id.*, at 310, 551 P. 2d, at 48.

[4] The plan provided for the mandatory reassignment of approximately 40,000 students in the fourth through eighth grades. Some of these children were bused over long distances requiring daily round-trip bus rides of as long as two to four hours. In addition, the plan provided for the voluntary transfer of some 30,000 students.

Respondent Bustop, Inc., unsuccessfully sought to stay implementation of the plan. See *Bustop, Inc.* v. *Board of Education,* 439 U. S. 1380 (1978) (REHNQUIST, J., in chambers); *Bustop, Inc.* v. *Board of Education,* 439 U. S. 1384 (1978) (POWELL, J., in chambers).

532

Equal Protection Clauses of the State Constitution.[5]   Proposition I conforms the power of state courts to order busing to that exercised by the federal courts under the Fourteenth Amendment:

> "[N]o court of this state may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause . . . ."[6]

---

[5] Proposition I was placed before the voters following a two-thirds vote of each house of the state legislature.   Cal. Const., Art. 18, § 1.   The State Senate approved the Proposition by a vote of 28 to 6, the State Assembly by a vote of 62 to 17.   The voters favored the Proposition by a vote of 2,433,312 (68.6%) to 1,112,923 (31.4%).   The Proposition received a majority of the vote in each of the State's 58 counties and in 79 of the State's 80 assembly districts.   California Secretary of State, Statement of the Vote, November 6, 1979, Election 3–4, 43–49.

[6] Proposition I added a lengthy proviso to Art. 1, § 7(a), of the California Constitution.   Following passage of Proposition I, § 7 now provides, in relevant part:

"(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; provided, that nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation.   In enforcing this subdivision or any other provision of this Constitution, no court of this state may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States

Following approval of Proposition I, the District asked the Superior Court to halt all mandatory reassignment and busing of pupils. App. 185. On May 19, 1980, the court denied the District's application. The court reasoned that Proposition I was of no effect in this case in light of the court's 1970 finding of *de jure* segregation by the District in violation of the Fourteenth Amendment. Shortly thereafter, the court ordered implementation of a revised desegregation plan, one that again substantially relied upon mandatory pupil reassignment and transportation.[7]

The California Court of Appeal reversed. 113 Cal. App. 3d 633, 170 Cal. Rptr. 495 (1981). The court found that the trial court's 1970 findings of fact would not support the conclusion that the District had violated the Federal Constitution through intentional segregation.[8] Thus, Proposition I

---

Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

. . . .

"Nothing herein shall prohibit the governing board of a school district from voluntarily continuing or commencing a school integration plan after the effective date of this subdivision as amended.

"In amending this subdivision, the Legislature and people of the State of California find and declare that this amendment is necessary to serve compelling public interests, including those of making the most effective use of the limited financial resources now and prospectively available to support public education, maximizing the educational opportunities and protecting the health and safety of all public school pupils, enhancing the ability of parents to participate in the educational process, preserving harmony and tranquility in this state and its public schools, preventing the waste of scarce fuel resources, and protecting the environment."

[7] The Superior Court ordered the immediate implementation of the revised plan. The District was unsuccessful in its effort to gain a stay of the plan pending appeal. See *Board of Education* v. *Superior Court*, 448 U. S. 1343 (1980) (REHNQUIST, J., in chambers).

[8] "When the 1970 findings of the trial court are reviewed in the light of the correct applicable federal law, it is apparent that no specific segregative intent with discriminatory purpose was found. The thrust of the

was applicable to the trial court's desegregation plan and would bar that part of the plan requiring mandatory student reassignment and transportation. Moreover, the court concluded that Proposition I was constitutional under the Fourteenth Amendment. *Id.*, at 654, 170 Cal. Rptr., at 509. The court found no obligation on the part of the State to retain a greater remedy at state law against racial segregation than was provided by the Federal Constitution. *Ibid.* The court rejected the claim that Proposition I was adopted with a discriminatory purpose. *Id.*, at 654–655, 170 Cal. Rptr., at 509.[9]

Determining Proposition I to be applicable and constitutional, the Court of Appeal vacated the orders entered by the Superior Court. The California Supreme Court denied hearing. App. to Pet. for Cert. 73a.[10] We granted certiorari. 454 U. S. 892 (1981).

---

findings of the trial court was that passive maintenance by the Board of a neighborhood school system in the face of widespread residential racial imbalance amounted to *de jure* segregation in violation of the Fourteenth Amendment. . . . But a school board has no duty under the Fourteenth Amendment to meet and overcome the effect of population movements." 113 Cal. App. 3d, at 645–646, 170 Cal. Rptr., at 503.

[9] The Court of Appeal also rejected the claim that Proposition I deprived minority children of a "vested right" to desegregated education in violation of due process. See *id.*, at 655–656, 170 Cal. Rptr., at 509–510. Petitioners no longer advance this claim.

[10] On March 16, 1981, the District directed that mandatory pupil reassignment under the Superior Court's revised plan be terminated on April 20, 1981. On that date, parents of children who had been reassigned were given the option of returning their children to neighborhood schools. According to respondent Board of Education, approximately 7,000 pupils took this option of whom 4,300 were minority students. Brief for Respondent Board of Education 10.

The state courts refused to enjoin termination of the plan. On April 17, 1981, however, the United States District Court for the Central District of California issued a temporary restraining order preventing termination of the plan. *Los Angeles NAACP v. Los Angeles Unified School District*, 513 F. Supp. 717. The District Court found that there was

## II

We agree with the California Court of Appeal in rejecting the contention that once a State chooses to do "more" than the Fourteenth Amendment requires, it may never recede.[11] We reject an interpretation of the Fourteenth Amendment so destructive of a State's democratic processes and of its ability to experiment. This interpretation has no support in the decisions of this Court.

Proposition I does not inhibit enforcement of any federal law or constitutional requirement. Quite the contrary, by its plain language the Proposition seeks only to embrace the requirements of the Federal Constitution with respect to mandatory school assignments and transportation. It would be paradoxical to conclude that by adopting the Equal Protection Clause of the Fourteenth Amendment, the voters of the State thereby had violated it. Moreover, even after Proposition I, the California Constitution still imposes a greater duty of desegregation than does the Federal Constitution. The state courts of California continue to have an obligation under state law to order segregated school districts to use voluntary desegregation techniques, whether or not there has been a finding of intentional segregation. The school districts themselves retain a state-law obligation to

---

a "fair chance" that intentional segregation by the District could be demonstrated. *Id.*, at 720. The District Court's order was vacated on the following day by the United States Court of Appeals for the Ninth Circuit. *Los Angeles Unified School District* v. *District Court*, 650 F. 2d 1004 (1981). On remand the District Court denied the District's motion to dismiss. This ruling has been certified for interlocutory appeal. See Brief for Respondent Board of Education 10, n. 4.

On September 10, 1981, the Superior Court approved a new, voluntary desegregation plan.

[11] Respondent Bustop, Inc., argues that far from doing "more" than the Fourteenth Amendment requires, the State actually violated the Amendment by assigning students on the basis of race when such assignments were not necessary to remedy a federal constitutional violation. See Brief for Respondent Bustop, Inc., 10–18. We do not reach this contention.

take reasonably feasible steps to desegregate, and they remain free to adopt reassignment and busing plans to effectuate desegregation.[12]

Nonetheless, petitioners contend that Proposition I is unconstitutional on its face. They argue that Proposition I employs an "explicit racial classification" and imposes a "race-specific" burden on minorities seeking to vindicate state-created rights. By limiting the power of state courts to enforce the state-created right to desegregated schools, petitioners contend, Proposition I creates a "dual court system" that discriminates on the basis of race.[13] They emphasize that other state-created rights may be vindicated by the state courts without limitation on remedies. Petitioners argue that the "dual court system" created by Proposition I is unconstitutional unless supported by a compelling state interest.

We would agree that if Proposition I employed a racial classification it would be unconstitutional unless necessary to further a compelling state interest. "A racial classification, regardless of purported motivation, is presumptively invalid

---

[12] In this respect this case differs from the situation presented in *Washington* v. *Seattle School District No. 1, ante,* p. 457.

In an opinion delivered after Proposition I was enacted, the California Supreme Court stated that "the amendment neither releases school districts from their state constitutional obligation to take reasonably feasible steps to alleviate segregation regardless of its cause, nor divests California courts of authority to order desegregation measures other than pupil school assignment or pupil transportation." *McKinny* v. *Oxnard Union High School District Board of Trustees,* 31 Cal. 3d 79, 92–93, 642 P. 2d 460, 467 (1982). Moreover, the Proposition only limits state courts when enforcing the State Constitution. Thus, the Proposition would not bar state-court enforcement of state *statutes* requiring busing for desegregation or for any other purpose. Cf. *Brown* v. *Califano,* 201 U. S. App. D. C. 235, 244, 627 F. 2d 1221, 1230 (1980) (legislation limiting power of federal agency to require busing by local school boards held constitutional in view of the "effective avenues for desegregation" left open by the legislation).

[13] "[I]t is racial discrimination in the judicial apparatus of the state, not racial discrimination in the state's schools, that petitioners challenge under the Fourteenth Amendment in this case." Brief for Petitioners 48.

and can be upheld only upon an extraordinary justification."
*Personnel Administrator of Massachusetts* v. *Feeney*, 442
U. S. 256, 272 (1979). See *McLaughlin* v. *Florida*, 379
U. S. 184, 196 (1964). But Proposition I does not embody a
racial classification.[14] It neither says nor implies that persons are to be treated differently on account of their race. It
simply forbids state courts to order pupil school assignment
or transportation in the absence of a Fourteenth Amendment
violation. The benefit it seeks to confer—neighborhood
schooling—is made available regardless of race in the discretion of school boards.[15] Indeed, even if Proposition I had a
racially discriminatory effect, in view of the demographic mix
of the District it is not clear which race or races would be affected the most or in what way.[16] In addition, this Court
previously has held that even when a neutral law has a dis-

---

[14] In *Hunter* v. *Erickson*, 393 U. S. 385 (1969), the Court invalidated a
city charter amendment which placed a special burden on racial minorities
in the political process. The Court considered that although the law was
neutral on its face, "the reality is that the law's impact falls on the minority." *Id.*, at 391. In light of this reality and the distortion of the political
process worked by the charter amendment, the Court considered that the
amendment employed a racial classification despite its facial neutrality.
In this case the elements underlying the holding in *Hunter* are missing.
See *infra*.

[15] A neighborhood school policy in itself does not offend the Fourteenth
Amendment. See *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S.
1, 28 (1971) ("Absent a constitutional violation there would be no basis for
judicially ordering assignment of students on a racial basis. All things
being equal, with no history of discrimination, it might well be desirable to
assign pupils to schools nearest their homes"). Cf. 20 U. S. C. § 1701: "(a)
The Congress declares it to be the policy of the United States that—(1)
all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and (2)
the neighborhood is the appropriate basis for determining public school
assignments."

[16] In the Los Angeles School District, white students are now the racial
minority, see n. 1, *supra*. Similarly, in Los Angeles County, racial minorities, including those of Spanish origin, constitute the majority of the population. See U. S. Dept. of Commerce, 1980 Census of Population and
Housing, California, Advance Reports 6 (Mar. 1981).

proportionately adverse effect on a racial minority, the Fourteenth Amendment is violated only if a discriminatory purpose can be shown.[17]

Similarly, the Court has recognized that a distinction may exist between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters.[18]   This distinction is implicit in the Court's repeated statement that the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place.   In *Dayton Bd. of Education* v. *Brinkman*, 433 U. S. 406, 414 (1977), we found that the school board's mere repudiation of an earlier resolution calling for desegregation did not violate the Fourteenth Amendment.[19]   In *Reitman* v. *Mulkey*, 387 U. S. 369, 376 (1967), and again in *Hunter* v. *Erickson*, 393 U. S. 385, 390, n. 5 (1969), we were careful to note that the laws under review did more than "mere[ly] repeal" existing antidiscrimination legislation.[20]

---

[17] See *Washington* v. *Davis*, 426 U. S. 229, 238–248 (1976); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 265 (1977); *James* v. *Valtierra*, 402 U. S. 137, 141 (1971).

[18] Proposition I is not limited to busing for the purpose of racial desegregation.   It applies neutrally to "pupil school assignment or pupil transportation" in general.   Even so, it is clear that court-ordered busing in *excess* of that required by the Fourteenth Amendment, as one means of desegregating schools, prompted the initiation and probably the adoption of Proposition I.

[19] See *Dayton Bd. of Ed.* v. *Brinkman*, 443 U. S., at 531, n. 5 ("Racial imbalance, we noted in *Dayton I*, is not *per se* a constitutional violation, and rescission of prior resolutions proposing desegregation is unconstitutional only if the resolutions were required in the first place by the Fourteenth Amendment").

[20] In *Hunter* we noted that "we do not hold that mere repeal of an existing [antidiscrimination] ordinance violates the Fourteenth Amendment." 393 U. S., at 390, n. 5.   In *Reitman* the Court held that California Proposition 14 was unconstitutional under the Fourteenth Amendment not because it repealed two pieces of antidiscrimination legislation, but because the Proposition involved the State in private racial discrimination: "Here

In sum, the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification.[21]

Were we to hold that the mere repeal of race-related legislation is unconstitutional, we would limit seriously the authority of States to deal with the problems of our heterogeneous population. States would be committed irrevocably to legislation that has proved unsuccessful or even harmful in practice. And certainly the purposes of the Fourteenth Amendment would not be advanced by an interpretation that discouraged the States from providing greater protection to racial minorities.[22] Nor would the purposes of the Amendment be furthered by requiring the States to maintain legislation designed to ameliorate race relations or to protect racial minorities but which has produced just the opposite effects.[23] Yet these would be the results of requiring a State

we are dealing with a provision which does not just repeal an existing law forbidding private racial discriminations. Section 26 was intended to authorize, and does authorize, racial discrimination in the housing market." 387 U. S., at 380–381.

[21] Of course, if the purpose of repealing legislation is to disadvantage a racial minority, the repeal is unconstitutional for this reason. See *Reitman* v. *Mulkey*, 387 U. S. 369 (1967).

[22] See *Palmer* v. *Thompson*, 403 U. S. 217, 228 (1971) ("To hold . . . that every public facility or service, once opened, constitutionally 'locks in' the public sponsor so that it may not be dropped . . . would plainly discourage the expansion and enlargement of needed services in the long run") (BURGER, C. J., concurring); *Reitman* v. *Mulkey, supra*, at 395 ("Opponents of state antidiscrimination statutes are now in a position to argue that such legislation should be defeated because, if enacted, it may be unrepealable") (Harlan, J., dissenting).

[23] In his dissenting opinion in *Reitman* v. *Mulkey, supra*, at 395, Justice Harlan remarked upon the need for legislative flexibility when dealing with the "delicate and troublesome problems of race relations." He noted:

"The lines that have been and must be drawn in this area, fraught as it is with human sensibilities and frailties of whatever race or creed, are difficult ones. The drawing of them requires understanding, patience, and

to maintain legislation that has proved unworkable or harmful when the State was under no obligation to adopt the legislation in the first place. Moreover, and relevant to this case, we would not interpret the Fourteenth Amendment to require the people of a State to adhere to a judicial construction of their State Constitution when that Constitution itself vests final authority in the people.

## III

Petitioners seek to avoid the force of the foregoing considerations by arguing that Proposition I is not a "mere repeal." Relying primarily on the decision in *Hunter* v. *Erickson, supra,* they contend that Proposition I does not simply repeal a state-created right but fundamentally alters the judicial system so that "those seeking redress from racial isolation in violation of state law must be satisfied with less than full relief from a state court."[24] We do not view *Hunter* as controlling here, nor are we persuaded by petitioners' characterization of Proposition I as something more than a mere repeal.

In *Hunter* the Akron city charter had been amended by the voters to provide that no ordinance regulating real estate on the basis of race, color, religion, or national origin could take effect until approved by a referendum. As a result of the charter amendment, a fair housing ordinance, adopted by the City Council at an earlier date, was no longer effective. In holding the charter amendment invalid under the Fourteenth Amendment, the Court held that the charter amendment was not a simple repeal of the fair housing ordinance. The

---

compromise, and is best done by legislatures rather than by courts. When legislation in this field is unsuccessful there should be wide opportunities for legislative amendment, as well as for change through such processes as the popular initiative and referendum." 387 U. S., at 395–396.

[24] Tr. of Oral Arg. 6. See *id.,* at 7–8 ("The fact that a state may be free to remove a right or remove a duty, does not mean that it has the same freedom to leave the right in place but simply, in a discriminatory way we argue, provide less than full judicial remedy").

amendment "not only suspended the operation of the existing ordinance forbidding housing discrimination, but also required the approval of the electors before any future [antidiscrimination] ordinance could take effect." 393 U. S., at 389–390. Thus, whereas most ordinances regulating real property would take effect once enacted by the City Council, ordinances prohibiting racial discrimination in housing would be forced to clear an additional hurdle.[25] As such, the charter amendment placed an impermissible, "special burde[n] on racial minorities within the governmental process." *Id.*, at 391.[26]

*Hunter* involved more than a "mere repeal" of the fair housing ordinance; persons seeking antidiscrimination housing laws—presumptively racial minorities—were "singled out for mandatory referendums while no other group . . . face[d] that obstacle." *James* v. *Valtierra,* 402 U. S. 137, 142 (1971). By contrast, even on the assumption that racial minorities benefited from the busing required by state law, Proposition I is less than a "repeal" of the California Equal Protection Clause. As noted above, after Proposition I, the State Constitution still places upon school boards a greater duty to desegregate than does the Fourteenth Amendment.

Nor can it be said that Proposition I distorts the political process for racial reasons or that it allocates governmental or judicial power on the basis of a discriminatory principle. "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the

---

[25] "In the case before us . . . the city of Akron has not attempted to allocate governmental power on the basis of any general principle. Here, we have a provision that has the clear purpose of making it more difficult for certain racial and religious minorities to achieve legislation that is in their interest." 393 U. S., at 395 (Harlan, J., concurring).

[26] The *Hunter* Court noted that although "the law on its face treats Negro and white, Jew and gentile in an identical manner," *id.*, at 391, a charter amendment making it more difficult to pass antidiscrimination legislation could only disadvantage racial minorities in the governmental process.

same." *Tigner* v. *Texas*, 310 U. S. 141, 147 (1940). Remedies appropriate in one area of legislation may not be desirable in another. The remedies available for violation of the antitrust laws, for example, are different than those available for violation of the Civil Rights Acts. Yet a "dual court system"—one for the racial majority and one for the racial minority—is not established simply because civil rights remedies are different from those available in other areas.[27] Surely it was constitutional for the California Supreme Court to caution that although "in some circumstances busing will be an appropriate and useful element in a desegregation plan," in other circumstances "its 'costs,' both in financial and educational terms, will render its use inadvisable." See n. 3, *supra*. It was equally constitutional for the people of the State to determine that the standard of the Fourteenth Amendment was more appropriate for California courts to apply in desegregation cases than the standard repealed by Proposition I.[28]

In short, having gone beyond the requirements of the Federal Constitution, the State was free to return in part to the standard prevailing generally throughout the United States. It could have conformed its law to the Federal Constitution in every respect. That it chose to pull back only in part, and by preserving a greater right to desegregation than exists under the Federal Constitution, most assuredly does not render the Proposition unconstitutional on its face.

---

[27] Petitioners contend that Proposition I only restricts busing for the purpose of racial discrimination. The Proposition is neutral on its face, however, and respondents—as well as the State in its *amicus* brief—take issue with petitioners' interpretation of the provision.

[28] Similarly, a "dual constitution" is not established when the State chooses to go beyond the requirements of the Federal Constitution in some areas but not others. Nor is a "dual executive branch" created when an agency is given enforcement powers in one area but not in another. Cf. *Brown* v. *Califano*, 201 U. S. App. D. C. 235, 627 F. 2d 1221 (1980) (upholding federal legislation prohibiting a federal executive agency, but not local school officials or federal courts, from requiring busing).

## IV

The California Court of Appeal also rejected petitioners' claim that Proposition I, if facially valid, was nonetheless unconstitutional because enacted with a discriminatory purpose. The court reasoned that the purposes of the Proposition were well stated in the Proposition itself.[29] Voters may have been motivated by any of these purposes, chief among them the educational benefits of neighborhood schooling. The court found that voters also may have considered that the extent of mandatory busing, authorized by state law, actually was aggravating rather than ameliorating the desegregation problem. See n. 1, *supra*. It characterized petitioners' claim of discriminatory intent on the part of millions of voters as but "pure speculation." 113 Cal. App. 3d, at 655, 170 Cal. Rptr., at 509.

In *Reitman* v. *Mulkey*, 387 U. S. 369 (1967), the Court considered the constitutionality of another California Proposition. In that case, the California Supreme Court had concluded that the Proposition was unconstitutional because it gave the State's approval to private racial discrimination. This Court agreed, deferring to the findings made by the California court. The Court noted that the California court was "armed . . . with the knowledge of the facts and circumstances concerning the passage and potential impact" of the Proposition and "familiar with the milieu in which that provision would operate." *Id.*, at 378. Similarly, in this case,

---

[29] The Proposition contains its own statement of purpose:

"[T]he Legislature and people of the State of California find and declare that this amendment is necessary to serve compelling public interests, including those of making the most effective use of the limited financial resources now and prospectively available to support public education, maximizing the educational opportunities and protecting the health and safety of all public school pupils, enhancing the ability of parents to participate in the educational process, preserving harmony and tranquility in this state and its public schools, preventing the waste of scarce fuel, resources, and protecting the environment."

again involving the circumstances of passage and the potential impact of a Proposition adopted at a statewide election, we see no reason to differ with the conclusions of the state appellate court.[30]

Under decisions of this Court, a law neutral on its face still may be unconstitutional if motivated by a discriminatory purpose.  In determining whether such a purpose was the motivating factor, the racially disproportionate effect of official action provides "an 'important starting point.'"  *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S., at 274, quoting *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 266 (1977).

Proposition I in no way purports to limit the power of state courts to remedy the effects of intentional segregation with its accompanying stigma.  The benefits of neighborhood schooling are racially neutral.  This manifestly is true in Los Angeles where over 75% of the public school body is composed of groups viewed as racial minorities.  See nn. 1 and 16, *supra*.  Moreover, the Proposition simply removes one means of achieving the state-created right to desegregated education.  School districts retain the obligation to alleviate segregation regardless of cause.  And the state courts still may order desegregation measures other than pupil school assignment or pupil transportation.[31]

---

[30] Cf. *Washington* v. *Davis*, 426 U. S., at 253 ("The extent of deference that one pays to the trial court's determination of the factual issue, and indeed, the extent to which one characterizes the intent issue as a question of fact or a question of law, will vary in different contexts") (STEVENS, J., concurring).

[31] In *Brown* v. *Califano, supra*, the Court of Appeals found that a federal statute preventing the Department of Health, Education, and Welfare (HEW) from requiring busing "to a school other than the school which is nearest the student's home," 42 U. S. C. § 2000d, was not unconstitutional. HEW retained authority to encourage school districts to desegregate through other means, and the enforcement powers of the Department of Justice were left untouched.  The court therefore concluded that the limits on HEW's ability to order mandatory busing did not have a discriminatory

Even if we could assume that Proposition I had a dispro-
portionate adverse effect on racial minorities, we see no rea-
son to challenge the Court of Appeal's conclusion that the
voters of the State were not motivated by a discriminatory
purpose. See 113 Cal. App. 3d, at 654–655, 170 Cal. Rptr.,
at 509. In this case the Proposition was approved by an
overwhelming majority of the electorate.[32] It received sup-
port from members of all races.[33] The purposes of the Propo-
sition are stated in its text and are legitimate, nondiscrimina-
tory objectives. In these circumstances, we will not dispute
the judgment of the Court of Appeal or impugn the motives
of the State's electorate.

Accordingly the judgment of the California Court of Ap-
peal is

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins,
concurring.

While I join the opinion of the Court, I write separately to
address what I believe are the critical distinctions between
this case and *Washington* v. *Seattle School District No. 1,*
*ante,* p. 457.

---

effect. And, having done so, it refused to inquire into legislative motiva-
tion: "Absent discriminatory effect, judicial inquiry into legislative motiva-
tion is unnecessary, as well as undesirable." 201 U. S. App. D. C., at 248,
627 F. 2d, at 1234 (footnote omitted).

[32] Cf. *Washington* v. *Davis, supra,* at 253 (STEVENS, J., concurring) ("It
is unrealistic . . . to invalidate otherwise legitimate action simply because
an improper motive affected the deliberation of a participant in the deci-
sional process. A law conscripting clerics should not be invalidated be-
cause an atheist voted for it").

[33] Proposition I received support from 73.9% of the voters in Los Angeles
County which has a "minority" population—including persons of Spanish
origin—of over 50%. California Secretary of State, Statement of the
Vote, November 6, 1979, Election 3. See n. 16, *supra.* By contrast, the
Proposition received its smallest percentage of the vote in Humboldt and
Marin Counties which are nearly all-white in composition.

The Court always has recognized that distortions of the political process have special implications for attempts to achieve equal protection of the laws. Thus the Court has found particularly pernicious those classifications that threaten the ability of minorities to involve themselves in the process of self-government, for if laws are not drawn within a "just framework," *Hunter* v. *Erickson*, 393 U. S. 385, 393 (1969) (Harlan, J., concurring), it is unlikely that they will be drawn on just principles.

The Court's conclusion in *Seattle* followed inexorably from these considerations. In that case the statewide electorate reallocated decisionmaking authority to "'mak[e] it *more* difficult for certain racial and religious minorities [than for other members of the community] to achieve legislation that is in their interest.'" *Washington* v. *Seattle School District No. 1, ante*, at 470 (emphasis in original), quoting *Hunter* v. *Erickson*, 393 U. S., at 395 (Harlan, J., concurring). The Court found such a political structure impermissible, recognizing that if a class cannot participate effectively in the process by which those rights and remedies that order society are created, that class necessarily will be "relegated, by state fiat, in a most basic way to second-class status." *Plyler* v. *Doe*, 457 U. S. 202, 233 (1982) (BLACKMUN, J., concurring).

In my view, something significantly different is involved in this case. State courts do not create the rights they enforce; those rights originate elsewhere—in the state legislature, in the State's political subdivisions, or in the state constitution itself. When one of those rights is repealed, and therefore is rendered unenforceable in the courts, that action hardly can be said to restructure the State's decisionmaking mechanism. While the California electorate may have made it more difficult to achieve desegregation when it enacted Proposition I, to my mind it did so not by working a structural change in the political *process* so much as by simply repealing the right to invoke a judicial busing remedy. Indeed, ruling for petition-

ers on a *Hunter* theory seemingly would mean that statutory affirmative-action or antidiscrimination programs never could be repealed, for a repeal of the enactment would mean that enforcement authority previously lodged in the state courts was being removed by another political entity.

In short, the people of California—the same "entity" that put in place the State Constitution, and created the enforceable obligation to desegregate—have made the desegregation obligation judicially unenforceable. The "political process or the decisionmaking mechanism used to *address* racially conscious legislation" has not been "singled out for peculiar and disadvantageous treatment," *Washington* v. *Seattle School District No. 1, ante,* at 485 (emphasis in original), for those political mechanisms that create and repeal the rights ultimately enforced by the courts were left entirely unaffected by Proposition I. And I cannot conclude that the repeal of a state-created right—or, analogously, the removal of the judiciary's ability to enforce that right—"'curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities.'" *Ante,* at 486, quoting *United States* v. *Carolene Products Co.,* 304 U. S. 144, 153, n. 4 (1938).

Because I find *Seattle* distinguishable from this case, I join the opinion and judgment of the Court.

JUSTICE MARSHALL, dissenting.

The Court today addresses two state ballot measures, a constitutional amendment and a statutory initiative, each of which is admittedly designed to substantially curtail, if not eliminate, the use of mandatory student assignment or transportation as a remedy for *de facto* segregation. In *Washington* v. *Seattle School District No. 1, ante,* p. 457 *(Seattle),* the Court concludes that Washington's Initiative 350, which effectively prevents school boards from ordering mandatory school assignment in the absence of a finding of *de jure* segregation within the meaning of the Fourteenth Amendment, is unconstitutional because "it uses the racial nature of an issue to define the governmental decisionmaking

structure, and thus imposes substantial and unique burdens on racial minorities." *Seattle, ante,* at 470. Inexplicably, the Court simultaneously concludes that California's Proposition I, which effectively prevents a state court from ordering the same mandatory remedies in the absence of a finding of *de jure* segregation, *is* constitutional because "having gone beyond the requirements of the Federal Constitution, the State was free to return in part to the standard prevailing generally throughout the United States." *Ante,* at 542. Because I fail to see how a fundamental redefinition of the governmental decisionmaking structure with respect to the same racial issue can be unconstitutional when the State seeks to remove the authority from local school boards, yet constitutional when the State attempts to achieve the same result by limiting the power of its courts, I must dissent from the Court's decision to uphold Proposition I.

## I

In order to understand fully the implications of the Court's action today, it is necessary to place the facts concerning the adoption of Proposition I in their proper context. Nearly two decades ago, a unanimous California Supreme Court declared that "[t]he segregation of school children into separate schools because of their race, even though the physical facilities and the methods and quality of instruction in the several schools may be equal, deprives the children of the minority group of equal opportunities for education and denies them equal protection and due process of the law." *Jackson* v. *Pasadena City School District,* 59 Cal. 2d 876, 880, 382 P. 2d 878, 880–881 (1963). Recognizing that the "right to an equal opportunity for education and the harmful consequences of segregation" do not differ according to the *cause* of racial isolation, the California Supreme Court declined to adopt the distinction between *de facto* and *de jure* segregation engrafted by this Court on the Fourteenth Amendment. *Id.,*

at 881, 382 P. 2d, at 881–882. Instead, the court clearly held that "school boards [must] take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause." *Id.*, at 881, 382 P. 2d, at 882.

As the California Supreme Court subsequently explained, the duty established in *Jackson* does not require that "each school in a district . . . reflect the racial composition of the district as a whole." *Crawford* v. *Board of Education*, 17 Cal. 3d 280, 302, 551 P. 2d 28, 42 (1976) *(Crawford I)*. Rather, it is sufficient that school authorities "take reasonable and feasible steps to eliminate *segregated* schools, i. e., schools in which the minority student enrollment is so disproportionate as realistically to isolate minority students from other students and thus deprive minority students of an integrated educational experience." *Id.*, at 303, 551 P. 2d, at 43 (emphasis in original). Moreover, the California courts have made clear that the primary responsibility for implementing this state constitutional duty lies with local school boards. "[S]o long as a local school board initiates and implements reasonably feasible steps to alleviate school segregation in its district, and so long as such steps produce meaningful progress in the alleviation of such segregation, and its harmful consequences, . . . the judiciary should [not] intervene in the desegregation process." *Id.*, at 305–306, 551 P. 2d, at 45. If, however, a school board neglects or refuses to implement meaningful programs designed to bring about an end to racial isolation in the public schools, "the court is left with no alternative but to intervene to protect the constitutional rights of minority children." *Id.*, at 307, 551 P. 2d, at 45. When judicial intervention is necessary, the court "may exercise broad equitable powers in formulating and supervising a plan which the court finds will insure meaningful progress to alleviate the harmful consequences of school segregation in the district." *Id.*, at 307, 551 P. 2d, at 46. Moreover, "once a school board defaults in its constitutional task, the court, in

devising a remedial order, is not precluded from requiring the busing of children as part of a reasonably feasible desegregation plan." *Id.*, at 310, 551 P. 2d, at 48.

Like so many other decisions protecting the rights of minorities, California's decision to eradicate the evils of segregation regardless of cause has not been a popular one. In the nearly two decades since the State Supreme Court's decision in *Jackson*, there have been repeated attempts to restrain school boards and courts from enforcing this constitutional guarantee by means of mandatory student transfers or assignments. In 1970, shortly after the San Francisco Unified School District voluntarily adopted a desegregation plan involving mandatory student assignment, the California Legislature enacted Education Code § 1009.5, Cal. Educ. Code Ann. § 1009.5, currently codified at Cal. Educ. Code Ann. § 35350 (West 1978), which provides that "[n]o governing board of a school district shall require any student or pupil to be transported for any purpose or for any reason without the written permission of the parent or guardian." In *San Francisco Unified School District* v. *Johnson*, 3 Cal. 3d 937, 479 P. 2d 669 (1971), the California Supreme Court interpreted this provision only to bar a school district from compelling students, without parental consent, to use means of transportation furnished by the district. Construing the statute to prohibit nonconsensual assignment of students for the purpose of eradicating *de jure* or *de facto* segregation, the court concluded, would clearly violate both the State and the Federal Constitutions by "exorcising a method that in many circumstances is the sole and exclusive means of eliminating racial segregation in the schools." *Id.*, at 943, 479 P. 2d, at 671.

The very next year, opponents of mandatory student assignment for the purpose of achieving racial balance again attempted to eviscerate the state constitutional guarantee recognized in *Jackson*. Proposition 21, which was enacted by referendum in November 1972, stated that "[n]o public school

student shall, because of his race, creed, or color, be assigned to or be required to attend a particular school." Predictably, the California Supreme Court struck down Proposition 21 "for the same reasons set forth by us in *Johnson.*" *Santa Barbara School District* v. *Superior Court,* 13 Cal. 3d 315, 324, 530 P. 2d 605, 613 (1975).

Finally, in 1979, the people of California enacted Proposition I. That Proposition, like all of the previous initiatives, effectively deprived California courts of the ability to enforce the state constitutional guarantee that minority children will not attend racially isolated schools by use of what may be "the sole and exclusive means of eliminating racial segregation in the schools," *San Francisco Unified School District* v. *Johnson, supra,* at 943, 479 P. 2d, at 671, mandatory student assignment and transfer. Unlike the earlier attempts to accomplish this objective, however, Proposition I does not purport to prevent mandatory assignments and transfers when such measures are predicated on a violation of the Federal Constitution. Therefore, the only question presented by this case is whether the fact that mandatory transfers may still be made to vindicate federal constitutional rights saves this initiative from the constitutional infirmity presented in the previous attempts to accomplish this same objective. In my view, the recitation of the obvious—that a state constitutional amendment does not override federal constitutional guarantees—cannot work to deprive minority children in California of their federally protected right to the equal protection of the laws.

## II

### A

In *Seattle,* the Court exhaustively set out the relevant principles that control the present inquiry. We there found that a series of precedents, exemplified by *Hunter* v. *Erickson,* 393 U. S. 385 (1969), and *Lee* v. *Nyquist,* 318 F. Supp. 710 (WDNY 1970) (three-judge court), summarily aff'd, 402 U. S. 935 (1971), establish that the Fourteenth Amendment

prohibits a State from allocating "governmental power non-neutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process." *Seattle, ante,* at 470 (emphasis in original). We concluded that "state action of this kind . . . 'places *special* burdens on racial minorities within the governmental process' . . . thereby 'making it *more* difficult for certain racial and religious minorities [than for other members of the community] to achieve legislation that is in their interest.'" *Ibid.* (emphasis in original), quoting *Hunter* v. *Erickson, supra,* at 391, 395 (Harlan, J., concurring).

It is therefore necessary to determine whether Proposition I works a "nonneutral" reallocation of governmental power on the basis of the racial nature of the decision. This determination is also informed by our decision in *Seattle.* In that case we were presented with a statewide initiative which effectively precluded local school boards from ordering mandatory student assignment or transfer except where required to remedy a constitutional violation. We concluded that the initiative violated the Fourteenth Amendment because it reallocated decisionmaking authority over racial issues from the local school board to a "new and remote level of government." *Seattle, ante,* at 483. In reaching this conclusion, we specifically affirmed three principles that are particularly relevant to the present inquiry.

First, we rejected the State's argument that a statewide initiative prohibiting mandatory student assignment has no "racial overtones" simply because it does not mention the words "race" or "integration." *Seattle, ante,* at 471. We noted that "[n]either the initiative's sponsors, nor the District Court, nor the Court of Appeals had any difficulty perceiving the racial nature of the issue settled by Initiative 350." *Ibid.* In light of its language and the history surrounding its adoption, we found it "beyond reasonable dispute . . . that the initiative was enacted '"because of," not merely "in spite of," its adverse effects upon' busing for inte-

gration." *Ibid.*, quoting *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 279 (1979). Moreover, we rejected the Solicitor General's remarkable contention, a contention also pressed here, that "busing for integration . . . is not a peculiarly 'racial' issue at all." *Seattle, ante,* at 471–472. While not discounting the value of an integrated education to nonminority students, we concluded that *Lee* v. *Nyquist, supra,* definitively established that "desegregation of the public schools . . . at bottom inures primarily to the benefit of the minority, and is designed for that purpose," thereby bringing it within the *Hunter* doctrine. *Seattle, ante,* at 472.

Second, the *Seattle* Court determined that Initiative 350 unconstitutionally reallocated power from local school boards to the state legislature or the statewide electorate. After the enactment of Initiative 350, local school boards continued to exercise considerable discretion over virtually all educational matters, including student assignment. Those seeking to eradicate *de facto* segregation, however, were forced to "surmount a considerably higher hurdle than persons seeking comparable legislative action," *Seattle, ante,* at 474, for instead of seeking relief from the local school board, those pursuing this racial issue were forced to appeal to a different and more remote level of government. Just as in *Hunter* v. *Erickson, supra,* where those interested in enacting fair housing ordinances were compelled to gain the support of a majority of the electorate, we held that this reallocation of governmental power along racial lines offends the Equal Protection Clause. Our holding was not altered by the fact that those seeking to combat *de facto* segregation could still pursue their cause by petitioning local boards to enact voluntary measures or by seeking action from the state legislature. Nor were we persuaded by the argument that no transfer of power had occurred because the State was ultimately responsible for the educational policy of local school boards. We found it sufficient that Initiative 350 had deprived those seek-

ing to redress a racial harm of the right to seek a particularly effective form of redress from the level of government ordinarily empowered to grant the remedy.

Finally, the Court's decision in *Seattle* implicitly rejected the argument that state action that reallocates governmental power along racial lines can be immunized by the fact that it specifically leaves intact rights guaranteed by the Fourteenth Amendment. The fact that mandatory pupil reassignment was still available as a remedy for *de jure* segregation did not alter the conclusion that an unconstitutional reallocation of power had occurred with respect to those seeking to combat *de facto* racial isolation in the public schools.

B

In my view, these principles inexorably lead to the conclusion that California's Proposition I works an unconstitutional reallocation of state power by depriving California courts of the ability to grant meaningful relief to those seeking to vindicate the State's guarantee against *de facto* segregation in the public schools. Despite Proposition I's apparent neutrality, it is "beyond reasonable dispute," *Seattle, ante,* at 471, and the majority today concedes, that "court-ordered busing in *excess* of that required by the Fourteenth Amendment . . . prompted the initiation and probably the adoption of Proposition I." *Ante,* at 538, n. 18 (emphasis in original).[1] Because "minorities may consider busing for integration to be 'legislation that is in their interest,'" *Seattle, ante,* at 474, quoting

---

[1] Just as in *Seattle,* the fact that other types of student transfers conceivably might be prohibited does not alter this conclusion: "Neither the initiative's sponsors, nor the District Court, nor the Court of Appeals had any difficulty perceiving the racial nature of the issue settled by" Proposition I. *Seattle, ante,* at 471. Indeed in their response to the petition for certiorari, respondents characterized Proposition I as addressing but "one narrow area: the power of a state court to order mandatory student assignment or transportation as a desegregation remedy." Brief in Opposition 9.

*Hunter* v. *Erickson*, 393 U. S., at 395 (Harlan, J., concurring), Proposition I is sufficiently "racial" to invoke the *Hunter* doctrine.[2]

Nor can there be any doubt that Proposition I works a substantial reallocation of state power.   Prior to the enactment of Proposition I, those seeking to vindicate the rights enumerated by the California Supreme Court in *Jackson* v. *Pasadena City School District*, 59 Cal. 2d 876, 382 P. 2d 878 (1963), just as those interested in attaining any other educational objective, followed a two-stage procedure. First, California's minority community could attempt to convince the local school board voluntarily to comply with its constitutional obligation to take reasonably feasible steps to eliminate racial isolation in the public schools.   If the board was either unwilling or unable to carry out its constitutional duty, those seeking redress could petition the California state courts to require school officials to live up to their obligations.   Busing could be required as part of a judicial remedial order. *Crawford I*, 17 Cal. 3d, at 310, 551 P. 2d, at 48.

Whereas Initiative 350 attempted to deny minority children the first step of this procedure, Proposition I eliminates by fiat the second stage: the ability of California courts to order meaningful compliance with the requirements of the State Constitution.   After the adoption of Proposition I, the only method of enforcing against a recalcitrant school board the state constitutional duty to eliminate racial isolation is to petition either the state legislature or the electorate as a whole.   Clearly, the rules of the game have been signifi-

---

[2] It is therefore irrelevant whether the "benefits of neighborhood schooling are racially neutral," as the majority asserts.   *Ante*, at 544; see *ante*, at 537.   In *Seattle*, *ante*, at 472, we specifically rejected the argument that because some minorities as well as whites supported the initiative, it could not be considered a racial classification.

cantly changed for those attempting to vindicate this state constitutional right.[3]

The majority seeks to conceal the unmistakable effects of Proposition I by calling it a "mere repeal" of the State's earlier commitment to do "'more' than the Fourteenth Amendment requires." *Ante,* at 535. Although it is true that we have never held that the "mere repeal of an existing [antidiscrimination] ordinance violates the Fourteenth Amendment," *Hunter* v. *Erickson, supra,* at 390, n. 5, it is equally clear that the reallocation of governmental power created by Proposition I is not a "mere repeal" within the meaning of any of our prior decisions.

In *Dayton Bd. of Education* v. *Brinkman,* 433 U. S. 406 (1977), the new members of the Dayton Board of Education repudiated a resolution drafted by their predecessors admitting the Board's role in the establishment of a segregated school system and calling for various remedial actions. In

---

[3] There can be no question that the practical effect of Proposition I will be to deprive state courts of "the sole and exclusive means of eliminating racial segregation in the schools." *San Francisco Unified School District* v. *Johnson,* 3 Cal. 3d 937, 943, 479 P. 2d 669, 671 (1971). As we have often noted, "bus transportation has long been an integral part of all public educational systems, and it is unlikely that a truly effective remedy could be devised without continued reliance upon it." *North Carolina Board of Ed.* v. *Swann,* 402 U. S. 43, 46 (1971). Moreover, Proposition I prevents a state court from ordering school officials to take any action respecting *pupil school assignment,* as well as pupil transportation. Presumably, state courts could not design a remedy involving the "pairing" or "clustering" of schools, even if such a remedy did not involve *any* "busing." In the present case, the state trial court found that the voluntary programs proposed by the Los Angeles School Board were "constitutionally suspect" because they "place[d] the burden of relieving the racial isolation of the minority student upon the minority student." App. 160. Consequently, since "a voluntary program would not serve to integrate the community's schools," *Seattle, ante,* at 473, n. 16, Proposition I, like the measures at issue in *Lee* v. *Nyquist,* 318 F. Supp. 710 (WDNY 1970) (three-judge court), summarily aff'd, 402 U. S. 935 (1971), and *Seattle,* precludes the effective enjoyment by California's minority children of their right to eliminate racially isolated schools.

concluding that the Board was constitutionally permitted to withdraw its own prior *mea culpa*, this Court was careful to note that *"[t]he Board had not acted to undo operative regulations affecting the assignment of pupils or other aspects of the management of school affairs."* *Id.*, at 413 (emphasis added). Therefore, the only time that this Court has squarely held that a "mere repeal" did not violate the Fourteenth Amendment, it was presented with a situation where a governmental entity rescinded *its own* prior statement of policy without affecting any existing educational policy. It is no surprise that such conduct passed constitutional muster.

By contrast, in *Seattle, Hunter,* and *Reitman* v. *Mulkey*, 387 U. S. 369 (1967),[4] the three times that this Court has explicitly rejected the argument that a proposed change constituted a "mere repeal" of an existing policy, the alleged rescission was accomplished by a governmental entity other than the entity that had taken the initial action, and resulted in a drastic alteration of the substantive effect of existing policy. This case falls squarely within this latter category. To be sure, the *right* to be free from racial isolation in the public schools remains unaffected by Proposition I. See *ante*, at 535–536; see *McKinny* v. *Oxnard Union High School District Board of Trustees*, 31 Cal. 3d 79, 92–93, 642 P. 2d 460, 467 (1982). But Proposition I does repeal the power of the state court to *enforce* this existing constitutional guarantee through the use of mandatory pupil assignment and transfer.

The majority asserts that the Fourteenth Amendment does not "require the people of a State to adhere to a judicial construction of their State Constitution when that Constitution itself vests final authority in the people." *Ante*, at 540. A state court's authority to order appropriate remedies for

---

[4] In *Reitman* v. *Mulkey*, this Court struck down another California ballot measure, granting every resident the absolute constitutional right to sell or rent his property to whomever he or she chooses. We held that the provision amounted to an unconstitutional authorization of private discrimination.

state constitutional violations, however, is no more based on the "final authority" of the people than the power of the local Seattle School Board to make decisions regarding pupil assignment is premised on the State's ultimate control of the educational process. Rather, the authority of California courts to order mandatory student assignments in this context springs from the same source as the authority underlying other remedial measures adopted by state and federal courts in the absence of statutory authorization: the "courts power to provide equitable relief" to remedy a constitutional violation. *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 30 (1971); *Crawford I*, 17 Cal. 3d, at 307, 551 P. 2d, at 46 ("a trial court may exercise broad equitable powers in formulating and supervising a plan which the court finds will insure meaningful progress to alleviate . . . school segregation"). Even assuming that the source of a court's power to remedy a constitutional violation can be traced back to "the people," the majority's conclusion that "the people" can therefore confer that remedial power on a discriminatory basis is plainly inconsistent with our prior decisions. In *Hunter* v. *Erickson*, 393 U. S., at 392, we struck down the referendum at issue even though the people of Akron, Ohio, undoubtedly retained "final authority" for all legislation. Similarly, in *Seattle* we concluded that the reallocation of power away from local school boards offended the Equal Protection Clause even though the State of Washington "is ultimately responsible for providing education within its borders." *Ante*, at 477. The fact that this change was enacted through popular referendum, therefore, cannot immunize it from constitutional review. See *Lucas* v. *Colorado General Assembly*, 377 U. S. 713, 736–737 (1964).

As in *Seattle*, *Hunter*, and *Reitman*, Proposition I's repeal of the state court's enforcement powers was the work of an independent governmental entity, and not of the state courts themselves. That this repeal drastically alters the substan-

tive rights granted by existing policy is patently obvious from the facts of this litigation.[5]   By prohibiting California courts from ordering mandatory student assignment when necessary to eliminate racially isolated schools, Proposition I has placed an enormous barrier between minority children and the effective enjoyment of their constitutional rights, a barrier that is not placed in the path of those who seek to vindicate other rights granted by state law.   This Court's precedents demonstrate that, absent a compelling state interest, which respondents have hardly demonstrated, such a discriminatory barrier cannot stand.[6]

---

[5] Indeed Proposition I by its express terms allows for the modification of existing plans upon the application of any interested person.   Art. 1, § 7(a).

[6] As the majority notes, Proposition I states that the "people of the State of California find and declare that this amendment is necessary to serve compelling public interests," including, *inter alia*, "making the most efficient use of . . . limited financial resources," protecting the "health and safety" of all students, preserving "harmony and tranquility," and "protecting the environment."   *Ante*, at 533, n. 6.   These purported justifications, while undoubtedly meritorious, are clearly insufficient to sustain the racial classification established by Proposition I.   As we have often noted, racial classifications may only be upheld where "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin* v. *Florida*, 379 U. S. 184, 196 (1964).   It goes without saying that a self-serving conclusory statement of necessity will not suffice to fulfill this burden.   See *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 28, 29–31 (1971) (rejecting a similar list of justifications for establishing a racial classification).   "In any event, [respondents] have failed to show that the purpose[s] they impute to the [Proposition] could not be accomplished by alternative methods, not involving racial distinctions."   *Lee* v. *Nyquist*, 318 F. Supp., at 720.

Parenthetically, it is interesting to note that the allegedly compelling interest in establishing "neighborhood schools" so often referred to by the majority appears nowhere in the official list of justifications.   The absence of any mention of this supposed justification is not surprising in light of the fact that the Proposition's ban on student "assignment" effectively prevents desegregation remedies that would not require a student to leave his "neighborhood."   See n. 3, *supra*.

The fact that California attempts to cloak its discrimination in the mantle of the Fourteenth Amendment does not alter this result. Although it might seem "paradoxical" to some Members of this Court that a referendum that adopts the wording of the Fourteenth Amendment might violate it, the paradox is specious. Because of the Supremacy Clause, Proposition I would have precisely the same legal effect if it contained no reference to the Fourteenth Amendment. The lesson of *Seattle* is that a State, in prohibiting conduct that is not required by the Fourteenth Amendment, may nonetheless create a discriminatory reallocation of governmental power that does violate equal protection. The fact that some less effective avenues remain open to those interested in mandatory student assignment to eliminate racial isolation, like the fact that the voters in *Hunter* conceivably might have enacted fair housing legislation, or that those interested in busing to eliminate racial isolation in *Seattle* conceivably might use the State's referendum process, does not justify the discriminatory reallocation of governmental decisionmaking.

In this case, the reallocation of power occurs in the judicial process—the major arena minorities have used to ensure the protection of rights "in their interest." *Hunter* v. *Erickson*, *supra*, at 395 (Harlan, J., concurring). Certainly, *Hunter* and *Seattle* cannot be distinguished on the ground that they concerned the reallocation of legislative power, whereas Proposition I redistributes the inherent power of a court to tailor the remedy to the violation. As we have long recognized, courts too often have been "the sole practicable avenue open to a minority to petition for redress of grievances." *NAACP* v. *Button*, 371 U. S. 415, 430 (1963). See *Reitman* v. *Mulkey*, 387 U. S., at 377 (invalidating state constitutional amendment because "[t]he right to discriminate, including the right to discriminate on racial grounds, was now embodied in the State's basic charter, immune from legislative, ex-

ecutive, *or judicial* regulation at any level of the state government") (emphasis added). It is no wonder, as the present case amply illustrates, that whatever progress has been made towards the elimination of *de facto* segregation has come from the California courts. Indeed, Proposition I, by denying full access to the only branch of government that has been willing to address this issue meaningfully, is far worse for those seeking to vindicate the plainly unpopular cause of racial integration in the public schools than a simple reallocation of an often unavailable and unresponsive legislative process. To paraphrase, "[i]t surely is an excessively formal exercise . . . to argue that the procedural revisions at issue in *Hunter* [and *Seattle*] imposed special burdens on minorities, but that the selective allocation of decisionmaking authority worked by [Proposition I] does not erect comparable political obstacles." *Seattle, ante,* at 475, n. 17.

## III

Even if the effects of Proposition I somehow can be distinguished from the enactments at issue in *Hunter* and *Seattle*, the result reached by the majority today is still plainly inconsistent with our precedents. Because it found that the segregation of the California public schools violated the Fourteenth Amendment, the state trial court never considered whether Proposition I was itself unconstitutional because it was the product of discriminatory intent. Despite the absence of *any* factual record on this issue, the Court of Appeal rejected petitioners' argument that the law was motivated by a discriminatory intent on the ground that the recitation of several potentially legitimate purposes in the legislation's preamble rendered any claim that it had been enacted for an invidious purpose "pure speculation." 113 Cal. App. 3d 633, 655, 170 Cal. Rptr. 495, 509 (1981).

In *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 266 (1977), we declared that "[d]etermining

whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Petitioners assert that the disproportionate impact of Proposition I, combined with the circumstances surrounding its adoption and the history of opposition to integration cited *supra,* at 548–551, clearly indicates the presence of discriminatory intent. See Brief for Petitioners 64–96. Yet despite the fact that *no inquiry* has been conducted into these allegations by either the trial or the appellate court, this Court, in its haste to uphold the banner of "neighborhood schools," affirms a factual determination that was never made. Such blind allegiance to the conclusory statements of a lower court is plainly forbidden by our prior decisions.[7]

## IV

Proposition I is in some sense "better" than the Washington initiative struck down in *Seattle.*[8] In their generosity, California voters have allowed those seeking racial balance to petition the very school officials who have steadfastly maintained the color line at the schoolhouse door to comply voluntarily with their continuing state constitutional duty to desegregate. At the same time, the voters have deprived minorities of the only method of redress that has proved effective—the full remedial powers of the state judiciary. In the name of the State's "ability to experiment," *ante,* at 535, the Court today allows this placement of yet another burden

---

[7] The majority's reliance on *Reitman* v. *Mulkey,* 387 U. S. 369 (1967), is therefore misplaced. How can any deference be given to the state court's "knowledge of the facts and circumstances concerning the passage and potential impact" of Proposition I, *id.,* at 378, when no such findings were ever made.

[8] Initiative 350, however, at least did "not hinder [the] State from enforcing [the State] Constitution." *Seattle, ante,* at 490, n. 3 (POWELL, J., dissenting).

in the path of those seeking to counter the effects of nearly three centuries of racial prejudice.  Because this decision is neither justified by our prior decisions nor consistent with our duty to guarantee all citizens the equal protection of the laws, I must dissent.