**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Bob MATHISEN, a.k.a. Robert Mathisen, Defendant and Appellant.**

**Cr. Nos. 987 and 995 to 1001.**

Supreme Court of North Dakota.

Oct. 23, 1984.

Owen K. Mehrer, State's Atty., Dickinson, for plaintiff and appellee; argued by Ronald L. Hilden, Asst. State's Atty., Dickinson.

James D. Gion, Regent, for defendant and appellant.

SAND, Justice.

Robert O. Mathisen appealed from judgments of conviction on eight counts of issuing checks without sufficient funds and from an amended judgment finding him in contempt for failure to comply with the conditions of a prior judgment. After the appeal was taken Mathisen filed a motion to vacate the convictions and dismiss the appeal on the basis that NDCC § 6–08–16, as amended in 1983, was declared unconstitutional by *State v. Fischer*, 349 N.W.2d 16 (N.D.1984).

The events leading to this appeal cover a lengthy span of time and encompass a host of intertwining judicial hearings and actions by the Stark County court. This case commenced on 6 June 1981 with a criminal complaint charging Mathisen with issuing two checks totaling $200.00 without sufficient funds in violation of North Dakota Century Code § 6–08–16. Mathisen's trial was set for 23 October 1981 but he failed to appear and the court issued a warrant for his arrest.

Over one year later, on 17 January 1983, Mathisen was arrested pursuant to the warrant and then released on personal recognizance pending his next court appearance. Mathisen failed to appear at his hearing and shortly thereafter was arrested on a bench warrant. On 4 March 1983 Mathisen appeared without counsel and pleaded guilty to the two counts of issuing a check without sufficient funds. The court accepted the plea and sentenced Mathisen to twenty days in jail, with ten days suspended on the condition he pay $200 in restitution and $100 in costs before 15 April 1983 and have no criminal convictions for one year. Mathisen failed to pay the restitution or costs. On 4 May 1983 he appeared before the court pursuant to an order to show cause why he had not complied with the terms of the criminal judgment. The order to show cause hearing was continued twice to allow Mathisen to secure counsel and was finally scheduled for 30 June 1983.

Contemporaneously with the foregoing events, between 2 February 1983 and 8 March 1983, Mathisen was charged by the Stark County state's attorney with eight counts of issuing a check without sufficient funds in violation of NDCC § 6–08–16. On 17 May 1983, at one of his numerous appearances before the court on these charges, Mathisen, without counsel, waived his right to a jury trial. Mathisen was then instructed to appear on 30 June 1983 for his trial and on the order to show cause hearing, which had been scheduled for the same day. Mathisen failed to appear on 30 June 1983 and once again an arrest warrant was issued.

Mathisen's next appearance before the Stark County court occurred approximately six and a half months later on 9 December 1983 following his arrest.[1] A date was set for Mathisen's trial and then was rescheduled after he requested court-appointed counsel. William Heth was appointed to represent Mathisen on the check charges, the order to show cause, and on the extradition matter.[2]

On 10 January 1984 Mathisen, represented by Heth, appeared in Stark County court for his trial on the check charges.[3] On the day of the trial, at Mathisen's request, Heth moved for a jury trial. The court in denying the motion held that Mathisen, after being fully advised of his constitutional rights, made a knowing and intelligent oral waiver of his right to a jury trial in open court on 17 May 1983. The court further noted that Mathisen had numerous opportunities and a significant period of time to request a jury trial but failed to do so.

At the trial Mathisen's sole defense was his testimony that when issuing the eight checks he was under the impression there were sufficient funds deposited in his account. In July 1979 Mathisen deposited a cashier's check for $4,100.00 in this account. Shortly thereafter payment on the cashier's check was stopped. Mathisen testified he was unaware payment could be stopped on a cashier's check. The court found Mathisen guilty on all eight counts of issuing a check without sufficient funds and sentenced him to 30 days in jail on each of the eight counts, with 15 days suspended on each count conditioned upon his making full restitution, paying costs of $328, and reimbursing Stark County for the fees of his court-appointed attorney, all by 1 October 1984. The court further ordered that Mathisen's period of confinement in Stark County was to run concurrently with any period of confinement served in South Dakota. At his subsequent order to show cause hearing Mathisen was found in contempt for failing to comply with any conditions of the previous criminal judgment and the court sentenced him to 10 days in jail, to be served concurrently with the prior sentence, and ordered restitution and costs to be paid.

Mathisen, acting pro se,[4] subsequently filed a series of motions for post-conviction relief. The Stark County court denied Mathisen's motions for a new trial, change of venue, arrest of judgment, and twice rejected a petition for writ of habeas corpus. Mathisen also petitioned this Court for habeas corpus relief which was denied. The Stark County court granted Mathisen's

---

1. Prior to his arrest, Mathisen had resided in Oregon for several months. Apparently during this time he was arrested by Oregon authorities and held for extradition to answer charges pending in South Dakota. Mathisen had been released by Oregon authorities on his own recognizance to attend his mother's funeral in North Dakota when he was arrested.

2. Following Mathisen's arrest on 12 September 1983, the Stark County court received a demand from South Dakota for extradition of Mathisen to stand for charges pending in Butte County, South Dakota.

3. Mathisen opposed extradition to South Dakota and prior to his trial on the check charges the court ordered Mathisen to be held in custody in Stark County pending extradition to South Dakota pursuant to NDCC § 29–30–02.

4. On 13 January 1984, upon his motion, the court allowed Heth to withdraw from representing Mathisen. The court subsequently appointed three separate attorneys to represent Mathisen and then allowed all three to withdraw. James Gion was then appointed and remains Mathisen's counsel for this appeal.

motion for a stay of execution of the sentence conditioned upon the posting of a $1,000 cash bond. Mathisen, unable to post the bond, served the entire unsuspended portion of his jail sentence and subsequently was extradited to South Dakota. On 18 May 1984 Mathisen's court-appointed counsel filed a motion in this Court seeking to vacate Mathisen's eight convictions and dismiss this appeal.

The defense by its motion and appeal raised the following issues:

1. Does *State v. Fischer*, 349 N.W.2d 16 (N.D.1984), which declared NDCC § 6–08–16 unconstitutional, require this Court to vacate the convictions?

2. Is a defendant's belief that he possessed sufficient funds a valid defense to NDCC § 6–08–16?

3. Did Mathisen effectively waive his right to a jury trial?

Mathisen contended that by implication *State v. Carpenter*, 301 N.W.2d 106 (N.D. 1980) and *State v. Fischer*, 349 N.W.2d 16 (N.D.1984), necessitate holding North Dakota Century Code § 6–08–16, as in effect in 1981, unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Art. I, §§ 21 and 22, of the North Dakota Constitution.

In *Carpenter*, NDCC § 6–08–16.2 (S.L. 1977, Ch. 77) was attacked as violating equal protection. Section 6–08–16.2 pertained to instances when the issuance of a nonsufficient funds (NSF) check constituted a class C felony. Section 6–08–16.2 required the holder of an NSF check to send a written notice to the drawer informing him the check had been dishonored and demanding payment within ten days. Section 6–08–16.2 specifically provided in part:

"... if the drawer pays the holder of the instrument within thirty days after receiving written notice of payment ... that fact shall constitute an affirmative defense to a criminal prosecution under this section."

The defendant in *Carpenter* argued that NDCC § 6–08–16.2 unconstitutionally discriminated on the basis of wealth. The defendant claimed that only those individuals unable to satisfy the NSF check upon notice of dishonor were prosecuted and, therefore, § 6–08–16.2 impermissibly burdened some individuals, i.e., indigents, while not burdening others similarly situated, i.e., issuers of NSF checks financially able to pay the holder after notice of dishonor.

The *Carpenter* Court determined that in equal protection claims criminal statutory classifications based upon wealth require an intermediate standard of judicial review. *Carpenter, supra* at 110. Applying that standard this Court held the above-quoted language of § 6–08–16.2 violated equal protection:

"While the state interest in preventing the issuance of nonsufficient fund checks is important, the classification based upon the ability of a defendant to pay for an affirmative defense to criminal prosecution is not substantially related to that interest. Thus, the classification based upon wealth constitutes a denial of equal protection to Carpenter, and, therefore, § 6–08–16.2, N.D.C.C., is constitutionally infirm." 301 N.W.2d at 110.

Subsequently, in *Fischer, supra*, the reasoning of *Carpenter* was applied to determine that NDCC § 6–08–16, as amended by the 1983 Legislature (S.L.1983, Ch. 116), also violated equal protection. NDCC § 6–08–16 as amended provided in part:

"A notice of dishonor must be sent by the holder of the check upon dishonor, prior to the institution of a criminal proceeding, the notice to be in substantially the following form: ... Payment to holder of the face amount of the instrument, plus any collection fees or costs, not exceeding the additional sum of ten dollars, shall constitute a defense to a criminal charge brought hereunder if paid within ten days from receipt of this notice of dishonor."

The *Fischer* Court held this language of § 6–08–16 was substantially identical to the language declared unconstitutional in *Carpenter*. NDCC § 6–08–16, by its 1983

amendments, therefore violated equal protection by creating a classification based on wealth with no substantial relationship to any important state interest. *Fischer, supra* at 18.

Mathisen contended that NDCC § 6–08–16, as in effect in 1981, contained language substantially equivalent to the statutes later declared unconstitutional in *Carpenter* and *Fischer* and, therefore, by implication is equally unconstitutional. However, the language of the 1981 version of § 6–08–16 is significantly dissimilar to the statutory provisions declared unconstitutional in *Carpenter* and *Fischer*. Unlike those statutes, § 6–08–16 did not require the holder to send to the drawer a written notice of dishonor demanding payment. Instead, § 6–08–16 merely accorded the holder the option to send such notice. More significantly, the statutory affirmative defense of payment found impermissible in *Carpenter* and *Fischer* was totally absent in § 6–08–16. In effect, § 6–08–16 permitted sending a notice of dishonor demanding payment, but did not set out the legal ramifications of such payment.

█ Unlike the statutes declared unconstitutional in *Carpenter* and *Fischer*, the 1981 version of § 6–08–16 makes no classification on the basis of wealth. It merely permits, but does not require, a notice of dishonor to be sent, nor does subsequent payment constitute an affirmative defense. Simply put, the 1981 version of § 6–08–16 does not make any statutory classification and therefore does not violate equal protection on its face. See *State v. Hatch*, 346 N.W.2d 268 (N.D.1984).

█ However, merely because § 6–08–16 is valid on its face does not make it immune from challenges on grounds of equal protection. A facially neutral statute may violate equal protection in its application or effect. *Crawford v. Board of Education of City of Los Angeles*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). Nevertheless Mathisen made no showing that § 6–08–16 created an impermissible wealth-based classification in its application or effect. Mathisen contended that § 6–08–16

was enforced in such a way so as to result in the same wealth-based classification held impermissible in *Carpenter* and *Fischer*. Mathisen claimed that state's attorneys informally insisted a notice of dishonor be sent prior the issuance of a criminal complaint and that there was no prosecution under § 6–08–16 if payment was made to the holder. In effect, Mathisen argued that violations of § 6–08–16 had been selectively prosecuted on the basis of wealth.

█ Selective prosecution if based upon improper motives can violate constitutional guarantees of equal protection. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). However, selective enforcement in and of itself is not a constitutional violation. *Oyler, supra; State v. Knoefler*, 325 N.W.2d 192 (N.D.1982). To support a defense of selective prosecution a defendant must establish that other individuals similarly situated have not generally been prosecuted and that the State's selection of him for prosecution is invidious or in bad faith; that is, based upon constitutionally impermissible considerations such as wealth. See *Knoefler, supra*.

We conclude that the 1981 version of § 6–08–16 does not violate the constitutional guarantees of equal protection. An earlier version of § 6–08–16, under which Mathisen's two prior convictions occurred, was substantially similar to the 1981 version of § 6–08–16 and therefore also passes constitutional muster.

Mathisen also contended his belief that funds sufficient to satisfy the outstanding checks were on deposit constituted a defense to NDCC § 6–08–16. In 1979 Mathisen deposited in his account $4,100 from a cashier's check. Shortly thereafter payment on the cashier's check was stopped and Mathisen was aware of this. Nevertheless, Mathisen claimed that payment on a cashier's check could not legally be stopped and, that when he issued the eight checks almost four years later, he was under the mistaken, yet innocent, belief that funds from the cashier's check were

still deposited in his account and sufficient to cover the eight checks.

■ Even though he may have erroneously deemed a cashier's check to be the equivalent of a certified check he nevertheless had knowledge that payment on the cashier's check was stopped. This alone put him on notice that his checking account did not have the proceeds of the cashier's check. His position in this respect is factitious.

■ In making this argument Mathisen essentially asserted a good-faith defense to violations of § 6–08–16. However, *State v. McDowell,* 312 N.W.2d 301 (N.D.1981), *cert. den.* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982), clearly established § 6–08–16 as a strict liability offense. It is immaterial whether or not Mathisen had an erroneous innocent impression that there were sufficient funds on deposit. He knew that a stop payment was made on the cashier's check. To hold otherwise would implicitly allow such "good faith" defenses to emasculate the enforcement and effect of § 6–08–16. See *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922).

However, merely because § 6–08–16 is a strict liability offense does not leave an accused without defenses to the charge of issuing a check without sufficient funds. The availability of affirmative defenses, see *e.g.,* NDCC Ch. 12.1–05, creates the opportunity to mitigate the possible harshness imposed by a criminal standard of strict liability. See *Carpenter, supra* at 111. In this instance Mathisen raised no affirmative defense and, instead, relied upon the existence of a good-faith defense; a defense we have refused to acknowledge. Therefore, we find this argument without merit.

Lastly, Mathisen asserted he did not validly waive his right to a jury trial because at the time of the alleged waiver he was without the assistance of counsel. It is not disputed that Mathisen had been informed of his constitutional rights to the assistance of counsel and a jury trial prior to his alleged waiver. At two separate court appearances Mathisen signed a statement of rights form acknowledging he had been read and understood his constitutional rights. At both of these appearances Mathisen stated his desire to be represented by counsel and that he would retain an attorney. Subsequently, when Mathisen allegedly made his waiver he appeared without counsel, having been unable to retain an attorney. At that time the following colloquy between the court and Mathisen occurred in open court:

"THE COURT: ... Now, Mr. Mathisen, do you know whether or not you desire a trial by jury in each of these matters?

"A. I don't think that'd be necessary.

"Q. You are at this time, then, waiving a trial by jury?

"A. Yes.

"Q. In each of the cases ... is that correct?

"A. Yes.

"Q. Very well, I will accept your waiver of trial by jury ...."

■ Clearly, Mathisen had the prerogative to waive his right to a jury trial. *Ex parte Kortgaard,* 66 N.D. 555, 267 N.W. 438, 105 A.L.R. 1107 (1936). However, the waiver must have been a "voluntary, knowing, and intelligent decision done with sufficient awareness of the relevant circumstances and likely consequences." *State v. Kranz,* 353 N.W.2d 748 (N.D.1984). North Dakota Rule of Criminal Procedure 23(a) acknowledges this right:

"Trial shall be by jury in all cases as provided by law unless the defendant waives a jury trial in writing or in open court with the approval of the court and consent of the prosecuting attorney."

■ Thus, NDRCrimP 23(a), as interpreted in *Kranz, supra,* sets out three requirements necessary for a valid waiver. First, the accused must make a "voluntary, knowing, and intelligent" waiver either in writing or open court. Second, the prosecuting attorney must consent to the waiver and, third, the court must approve. Clearly, the judge approved of Mathisen's waiv-

er. The record fails to indicate if the prosecuting attorney affirmatively consented to the waiver. However, the issue of the prosecuting attorney's consent was not raised by Mathisen in the trial court and consequently it will not be considered an issue on appeal. *Kilzer v. Binstock,* 339 N.W.2d 569 (N.D.1983).

The final determination is, therefore, whether or not Mathisen's waiver was a voluntary, knowing, and intelligent decision. Trial by jury is the normal and preferred mode of fact-finding in criminal adjudications. *Kranz, supra.* Because of the importance attached to jury trials the trial court, before approving a waiver, must be satisfied it was voluntary, knowing, and intelligent. *Kranz, supra.* Such determinations depend upon the unique circumstances of each case. *Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942). The fact that Mathisen made his waiver without the assistance of counsel is not in itself dispositive of the issue. The United States Supreme Court has held an accused can validly waive his right to a jury trial without the benefit of counsel. *Adams, supra.* The absence of counsel is simply one of the factors relevant to a finding of a voluntary, knowing, and intelligent waiver. *Adams, supra.*

■ Mathisen was properly apprised by the court of his right to a jury trial. He appeared in court without counsel on his own volition. The trial court duly obtained on the record Mathisen's express statements specifically indicating his waiver of a jury trial. Given these facts the trial court was not in error in determining Mathisen voluntarily, knowingly, and intelligently waived his right to a jury trial.

■ Additionally, we conclude the trial court's denial of Mathisen's request for a jury trial, immediately preceding his trial and subsequent to his valid waiver, did not constitute error under the circumstances of this case. On the day of his trial Mathisen's court-appointed counsel, at Mathisen's insistence, requested a jury trial. The court denied the request holding that

Mathisen had previously waived his right to a jury trial and since that time he had numerous opportunities to request a jury trial and failed to do so. It is important to note that when Mathisen requested a jury trial a jury panel had not been summoned and, therefore, granting his request would have entailed continuing the trial in order to empanel a jury. Also, the State had arranged the attendance of nine witnesses who would have had to be recalled if the trial were continued. The court was aware that Mathisen's trial on these matters had been continued repeatedly either at Mathisen's request or because of his failure to appear. Circumstances such as these could not be disregarded by the trial court in considering Mathisen's request for a jury trial subsequent to his valid waiver of that right.

Following the denial of Mathisen's request for a jury trial he admitted in court to issuing the eight checks. It was clearly established that at the time of the presentment he had insufficient funds in his account. Mathisen's entire defense rested upon the existence of a good-faith defense to NDCC § 6–08–16, a defense which did not legally exist. Mathisen did not present any facts to establish any affirmative defenses and, therefore, no uncontroverted facts existed. Consequently, the denial of Mathisen's request for a jury trial was not erroneous.

For the reasons stated in the opinion, the judgments of the trial court are affirmed.

ERICKSTAD, C.J., and GIERKE and VANDE WALLE, JJ., concur.

PEDERSON, Justice, concurring in the results.

In my view all versions of the "bad check" law have been valid. I did not agree with the majority in *Fischer* nor in *Carpenter;* accordingly, I do not accept the stated reasons for upholding the 1981 version of § 6–08–16, NDCC. I cannot envision a bad check law that is not based upon the principle that checks can be written only by people who have funds. That

basic principle is, of course, "discriminatory" against people who have no funds. It is not "invidious." Creating an after-the-fact method of distinguishing errors in balancing a checking account from "passing rubber checks" is a proper objective for legislative action and our entire commercial system is dependent upon it.